No. 24-1825

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

       v.

HARLAN LEROY KELLY, JR,

     Defendant-Appellant.

_____

**BRIEF FOR THE UNITED STATES AS APPELLEE – <u>REDACTED</u>**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 3:21-CR-402-RS-1
_____

**PATRICK D. ROBBINS**
Acting United States Attorney

**MERRY JEAN CHAN**
Chief, Appellate Section, Criminal Division

**ROSS D. MAZER**
Assistant United States Attorney

450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7033

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

**March 14, 2025**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTION, TIMELINESS, AND BAIL STATUS ...........................................2

ISSUES PRESENTED ...........................................................2

STATEMENT OF THE CASE ...........................................................3

    A.    Offense conduct ...........................................................3

        1.    Kelly and Walter Wong's bribery scheme ...............................3

        2.    The Quicken Loan bank fraud scheme .....................................6

    B.    Charges ...........................................................8

    C.    Pretrial litigation ...........................................................9

    D.    Verdict, sentencing, and post-trial motions ........................................10

SUMMARY OF ARGUMENT ...........................................................11

ARGUMENT ...........................................................12

I.    THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY
ON HONEST SERVICES FRAUD ...........................................................12

    A.    Standard of review ...........................................................13

    B.    Background ...........................................................14

        1.    Instruction No. 9, on the permissible uses of local ethics
violations ...........................................................14

        2.    Instruction No. 25, on the elements of honest services fraud ...16

    C.    The jury instructions were correct ........................................18

        1.    Instruction No. 9 ...........................................................18

        2.    Instruction No. 25 ...........................................................21

i

D.    Any error would have been harmless.................................................26

E.    Kelly has not raised an evidentiary claim, and any such claim would fail................................................................................................27

II.    THE DISTRICT COURT CORRECTLY DENIED KELLY'S MOTION TO DIMISS BASED ON THE COMPOSITION OF THE GRAND JURY ............................................................................................30

A.    Standard of review..............................................................................30

B.    Background .........................................................................................30

C.    Kelly failed to make a prima facie showing of a violation of his right to a jury selected from a fair cross section of the community....34

1.    The district court correctly rejected Kelly's claim under the Sixth Amendment and the JSSA .........................................34

(i)    The first Duren prong is met...........................................35

(ii)    Kelly has failed to demonstrate sufficient underrepresentation under Duren's second prong..........35

(a)    Legal standards.....................................................35

(b)    Absolute disparity test.........................................38

(c)    Comparative disparity test...................................39

(d)    Standard deviation................................................40

(e)    Legal significance.................................................41

(f)    Kelly's arguments are meritless ...........................43

(iii)    Kelly has failed to demonstrate systemic exclusion under Duren's third prong..............................45

2.    The district court correctly rejected Kelly's Equal Protection Claim ...............................................................49

CONCLUSION ....................................................................................................51

ii

STATEMENT OF RELATED CASES ................................................................52

CERTIFICATE OF COMPLIANCE ...............................................................53

# TABLE OF AUTHORITIES

## Federal Cases

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)....................................24

*Berghuis v. Smith*, 559 U.S. 314 (2010) ....................................35

*Castaneda v. Partida*, 430 U.S. 482 (1977).......................................... 37, 40, 49, 50

*Duren v. Missouri*, 439 U.S. 357 (1979) ......................................... 34, 35, 45, 46, 47

*Hernandez v. New York*, 500 U.S. 352 (1991).........................................50

*Howell v. Superintendent Rockview SCI*, 939 F.3d 260 (3d Cir. 2019) .................39

*McDonnell v. United States*, 579 U.S. 550 (2016) ......................................... 18, 23

*Percoco v. United States*, 598 U.S. 319 (2023) .......................................19

*Randolph v. People of the State of Cal.*, 380 F.3d 1133 (9th Cir. 2004).... 45, 46, 47

*Skilling v. United States*, 561 U.S. 358 (2010) .........................................20

*Taylor v. Louisiana*, 419 U.S. 522 (1975) .....................................34

*Thomas v. Borg*, 159 F.3d 1147 (9th Cir. 1998)........................................38

*United States v. Alessa*, 22-10107, 2024 WL 4211519 (9th Cir. Sept. 17, 2024)...44

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000)............................39

*United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 7184483 (E.D.
   Wash. Dec. 8, 2021)..............................................................................41

*United States v. Esquivel*, 88 F.3d 722 (9th Cir. 1996) ............................. 35, 50, 51

*United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013).........................................22

*United States v. Hernandez-Estrada*,
   749 F.3d 1154 (9th Cir. 2014) ..................... 36, 37, 38, 41, 45, 46, 48, 49, 50, 51

*United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000)..........................................24

*United States v. Jones*, 91 F.3d 156 (9th Cir. 1996).........................................42

iv

*United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009) ........................22

*United States v. Kliefen*, 557 F.2d. 1293 (9th Cir. 1977) .......................................38

*United States v. Knight*, No. 3:19-CR-38-MMD-CLB, 2021 WL 951885
    (D. Nev. Mar. 11, 2021)....................................................... 41, 44, 50

*United States v. Knight*, No. 21-10197, 2023 WL 34698
    (9th Cir. Jan. 4, 2023) ........................................................ 41, 44, 50

*United States v. Leyva*, 282 F.3d 623 (9th Cir. 2002) ............................................24

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2017) ..............................................13

*United States v. Makras*, 22-10355, 2024 WL 1461950
    (9th Cir. April 4, 2024) ..................................................................9, 10

*United States v. Mangano*, 128 F.4th 442 (2d Cir. 2025)......................................19

*United States v. McElroy*, 910 F.2d 1016 (2d Cir. 1990) ......................................25

*United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985)................................... 35, 45

*United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012)..................... 19, 22, 25

*United States v. Mujahid*, 433 F. App'x 559 (9th Cir. 2011) ................................50

*United States v. Nelson*, 712 F.3d 498 (11th Cir. 2013)........................................24

*United States v. Nelson*, 718 F.2d 315 (9th Cir. 1983)..........................................34

*United States v. Nichol*, 134 F. App'x 135 (9th Cir. 2005) ...................................28

*United States v. Orange*, 447 F.3d 792 (10th Cir. 2006).......................................39

*United States v. Panaro*, 266 F.3d 939 (9th Cir. 2001).........................................28

*United States v. Peleti*, 576 F.3d 377 (7th Cir. 2009)............................................23

*United States v. Pommerening*, 500 F.2d 92 (10th Cir. 1974) ..............................25

*United States v. Potter*, 552 F.2d 901 (9th Cir. 1977)...........................................36

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996)................................... 37, 40, 41

*United States v. Roberto*, 23-2026, 2025 WL 484702 (9th Cir. Feb. 13, 2025)......47

*United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005) ............................36

*United States v. Saini*, 23 F.4th 1155 (9th Cir. 2022)..............................................29

*United States v. Sanchez-Lopez*, 879 F.2d 541 (9th Cir. 1989)........................ 30, 40

*United States v. Sanders*, 421 F.3d 1044 (9th Cir. 2005) ........................................29

*United States v. Savage*, 970 F.3d 217 (3d Cir. 2020)..............................................39

*United States v. Schweitzer*, 35 F. App'x 331 (9th Cir. 2002) ................................24

*United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) ..........................................14

*United States v. Smith*, 457 F. Supp. 3d 734 (D. Alaska 2020)................. 40, 44, 48

*United States v. Smith*, No. CR 19-324 (BAH), 2022 WL 425059
    (D.D.C. Feb. 11, 2022) ......................................................................................39

*United States v. Solakyan*, 119 F.4th 575 (9th Cir. 2024) ........................ 20, 22, 26

*United States v. Suttiswad*, 696 F.2d 645 (9th Cir. 1982) ................................ 38, 42

*United States v. Walker*, 490 F.3d 1282 (11th Cir. 2007) ................................ 20, 29

*United States v. Yandell*, No. 2:19-CR-00107-KJM, 2024 WL 4700074
    (E.D. Cal. Nov. 5, 2024) ................................................................................ 41, 44

Federal Statutes

18 U.S.C. § 371 ............................................................................................................8

18 U.S.C. § 1014 ..........................................................................................................9

18 U.S.C. § 1343 ..........................................................................................................9

18 U.S.C. § 1344 ..........................................................................................................9

18 U.S.C. § 1346 ......................................................................................................9, 22

18 U.S.C. § 1349 ..........................................................................................................9

18 U.S.C. § 3231 ............................................................................................2

28 U.S.C. § 1291 ............................................................................................2

28 U.S.C. § 1861 ..........................................................................................34

### Federal Rules

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................................2, 3

Fed. R. App. P. 28 ...................................................................................12, 27

Fed. R. Evid. 403 .........................................................................................28

Fed. R. Evid. 404(b) ............................................................................14, 16, 18

No. 24-1825

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

       v.

HARLAN LEROY KELLY, JR,

    Defendant-Appellant.

_____

**BRIEF FOR THE UNITED STATES AS APPELLEE**

Defendant-Appellant Harlan Kelly appeals his convictions, following a jury trial, for honest services fraud, conspiracy to commit honest services fraud, and crimes related to bank fraud. The trial evidence showed that Kelly, a high-ranking city official in San Francisco, steered city funds toward a contractor in exchange for bribes, and then made false statements to a financial institution about his personal finances. On appeal, Kelly challenges the district court's instructions on honest services fraud and denial of his motion to dismiss based on the underrepresentation of African American eligible grand jurors. The district court correctly rejected these claims below. This Court should affirm.

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.  Judgment was entered on March 18, 2024.  1-ER-2.[1]  Kelly filed a timely notice of appeal on March 26, 2024.  7-ER-1680; Fed. R. App. P. 4(b)(1)(A)(i).  He is serving his 48-month sentence at FCI Leavenworth with a projected release date of August 31, 2026.  http://bop.gov/inmateloc/ (Register Number: 21827-509).

## ISSUES PRESENTED

1.      Whether the district court properly instructed the jury on honest services fraud, where the court's instruction followed the model instruction that this Court has previously approved.

2.      Whether the district court correctly denied Kelly's motion to dismiss based on the composition of the grand jury, where Kelly failed to make a prima facie showing that underrepresentation of African American eligible grand jurors was legally significant, due to system exclusion, or reflected discriminatory intent.

---

[1]  CR refers to the record of the district court clerk; AOB to Appellant-Kelly's opening brief; ER to Kelly's excerpts of record; SER to the government's supplemental excerpts of record; and PSR to the Presentence Investigation Report, filed under seal in compliance with Circuit Rule 27-13(d).

## STATEMENT OF THE CASE

### A.   Offense conduct[2]

#### 1.   *Kelly and Walter Wong's bribery scheme*

From 2012 to 2020, Kelly was the General Manager of the San Francisco Public Utilities Commission (PUC). PSR ¶ 10. His wife, Naomi Kelly (Naomi), was the San Francisco City Administrator, the highest non-elected position in city government. *Id.* For years, Kelly accepted a stream of benefits from Walter Wong, a corrupt contractor who owned a group of businesses that sought contracts with the City of San Francisco, in return for helping Wong in trying to secure a multi-million dollar contract to install thousands of "Smart LED" streetlights in San Francisco. 4-ER-677, 4-ER-682; PSR ¶¶ 12, 24.

The corruption alleged in this case began in 2013. PSR ¶ 24. At the time, Kelly was engaged in a remodeling project of his San Francisco residence turning it into a three-story home that would be valued at over $2.3 million. *See* 3-ER-474–76; 5-ER-1001. By the fall of 2013, after more than a year and $700,000 of construction work, Kelly's remodeling project was in financial straits. *See* 5-ER-970–71, 5-ER-1068–69; PSR ¶¶ 15, 22. So Kelly turned to Walter Wong for help. *See* 4-ER-678.

---

[2] The following summary is drawn from the trial transcripts and PSR.

Wong did not disappoint. His construction crews undertook what would become over 10 months of construction and repair work on Kelly's home. 4-ER-680; PSR ¶ 24. For example, they built a deck, installed landscaping and lighting, and imported and then installed a $7,000 wine cellar in Kelly's basement. 5-ER-1219, 5-ER-1221–22; 6-ER-1469–73. Yet despite the extent of this work, Wong never entered into a construction contract with Kelly, provided an estimate, or demanded a down payment. 4-ER-678–79; PSR ¶ 28. Nor did he receive any payment for over a year. PSR ¶ 26. But for Wong, that was not the point. As he testified at trial, he was providing illicit benefits to Kelly so that Kelly would help him win more lucrative business from the PUC. 4-ER-684 (testifying that he did not "intend to bill Kelly anyway because [he] intend[ed] to get [a] larger contract from the PUC").

Wong also spent money on Kelly in other ways. In March 2016, Wong helped arrange a vacation to Hong Kong and China for Kelly and his family. 4-ER-677; PSR ¶ 30. Wong accompanied them for part of the trip. 4-ER-677; PSR ¶ 30. Wong paid for the Kellys to stay at five-star luxury hotels, including the Ritz Carlton in Guangzhou, China, and the St. Regis in Macau. 4-ER-750–51; PSR ¶ 30. He paid for them to take a daytrip through an animal park in Guangzhou and a gondola ride to the top of Hong Kong Island. 4-ER-703; PSR ¶ 30. He paid for

4

their meals, including a $615 buffet dinner at the Intercontinental Hotel. 4-ER-711; PSR ¶ 30. He even paid a hospital bill for Kelly's son. 4-ER-748; PSR ¶ 30.

Meanwhile, Kelly was spearheading an effort by the PUC to put out bids for a contract to install thousands of "Smart" LED streetlights that could be controlled wirelessly from a central location. PSR ¶¶ 27–28. This PUC contract would have netted Wong and his companies over $1.6 million in profit. PSR ¶ 28. The contract was first announced publicly by the PUC in a Request for Proposal (RFP) posted on the PUC's website. 2-ER-103; PSR ¶ 27; *see also* 2-ER-114, 2-ER-121. Wong's company submitted a bid of over $9 million in March 2015. PSR ¶ 28. However, the PUC decided not to award a contract based on the current specifications, and instead issued a revised RFP in late 2016. PSR ¶ 29. Wong's company submitted another bid of over $2.7 million. PSR ¶ 29.

Throughout the protracted bidding process, Kelly provided Wong with internal PUC documents and information that helped Wong's company prepare its bids. PSR ¶ 28; 4-ER-686–87; *see also* 3-ER-556. These documents contained confidential information relating to the specifics of other companies' bids, the PUC's internal evaluations, and technical specifications for LED lights. *See, e.g.*, 2-ER-304–05; 3-ER-563–65; 4-ER-688–90, 4-ER-830. One document, for example, was specifically notated as "Confidential" and included a spreadsheet

with an overview of the competing bids and the PUC's preliminary evaluation of them. 2-ER-254–57; PSR ¶ 31 & n.1.

Disclosing this type of information to a bidder violated PUC rules and regulations. 2-ER-98, 2-ER-132, 2-ER-135, 2-ER-210–11, 2-ER-255, 2-ER-330. Under PUC rules, information relating to a procurement process was confidential from commencement of the process through the award of a contract to protect the integrity of the competitive bidding process. *See, e.g.*, 2-ER-97–99, 2-ER-118–19, 2-ER-202–03, 2-ER-210–11, 2-ER-240–41, 2-ER-303-06; 3-ER-371–76, 3-ER-380–81.

Although Wong's company was not awarded the LED smart lights contract, his construction crews continued work on Kelly's residence, and in 2018 and 2019, Kelly directed his subordinates at the PUC to buy over $57,000 in holiday light fixtures from a company that Wong controlled. 4-ER-678; PSR ¶ 32.

### 2. *The Quicken Loan bank fraud scheme*

Kelly also perpetrated a bank fraud scheme which involved him making false statements on mortgage loan application documents submitted to Quicken Loans, a mortgage lending and financial institution. PSR ¶ 13.

To finance his initial home renovation in 2012, Kelly turned to Victor Makras, a real estate broker and principal of Makras Real Estate, a corporation that sold residential real estate and managed properties in San Francisco. PSR ¶ 11.

Makras arranged to lend Kelly $715,000 through an interest-only private loan from a consortium of Makras Investors. PSR ¶ 15. That loan was coming due in early 2014, but Kelly's construction project was still underway. Drowning in construction and credit card debt, Kelly was struggling to refinance his home to repay the Makras investors. PSR ¶ 16. At Kelly's request, Makras personally extended him a loan for $70,000 to pay down his and Neomi's credit card debt. *Id.* Rather than give the money to Kelly, Makras instead paid the Kellys' credit card bills directly to conceal the loan from potential mortgage lenders. *Id.* Makras texted Kelly that "banks don't like seeing anything unusual about the flow of cash in or out of the cashing and savings accounts." *Id.* Despite this, Kelly was still unable to secure a mortgage refinance loan on favorable terms.

So Kelly and Makras devised the fraudulent scheme for which they were convicted at trial. PSR ¶ 17. At Kelly's request, Makras wrote a fraudulent "Straight Note," which falsely claimed that Makras had loaned the Kellys an additional $200,000, making it appear that the Kellys' total home mortgage was $915,000 instead of $715,000. *Id.* Armed with the fraudulent "Straight Note," which was also backdated to appear to have been executed in December 2013, Kelly submitted a loan application to Quicken Loans that falsely claimed that the Kellys had a $915,000 mortgage with Makras and his investors. PSR ¶¶ 17–19. Kelly did not tell Quicken that he owed Makras $70,000 for paying down his and

7

Neomi's credit cards, or that he owed another $89,000 in unpaid construction debt. PSR ¶ 19. Nor did he tell Quicken that he was requesting an inflated mortgage loan to pay down these debts. *Id.* In October 2014, Quicken Loans approved Kelly's loan application and funded a $1.3 million refinance mortgage loan. PSR ¶ 21.

Trial evidence established that Quicken considered Kelly's false statements material. PSR ¶ 23. Quicken would not have approved the loan application had Kelly disclosed that he had over $89,000 in unpaid construction debt because this type of debt could result in a lien on the property, which would impair Quicken's ability to collect repayment. 5-ER-992. Nor would Quicken have approved the mortgage loan had it known about the $70,000 interest-free loan from Makras. 5-ER-989.

### B. Charges

In October 2021, a federal grand jury returned a seven-count indictment against Kelly and Makras. CR-1. In January 2022, the district court granted in part a motion to sever Kelly's and Makras's trials. CR-42.

On May 31, 2022, a federal grand jury returned a nine-count superseding indictment against Kelly and Makras. 7-ER-1766. Both defendants were charged with four counts relating to bank fraud: conspiracy to make a false statement to a bank, in violation of 18 U.S.C. § 371 (Count One); making a false statement to a

8

bank, in violation of 18 U.S.C. § 1014 (Count Two); conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Three); and bank fraud, in violation of 18 U.S.C. § 1344 (Count Four). 7-ER-1773–76. Kelly alone was charged in the remaining five counts with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count Five); and honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 (Counts Six through Nine). 7-ER-1782–83. Count Six was dismissed before trial. *See* 6-ER-1430.

After the superseding indictment was filed, Makras renewed his motion to sever his trial from Kelly's. CR-70. In June 2022, the district court granted the motion and severed the trials. CR-79.[3]

### C.    Pretrial litigation

Prior to trial, Kelly moved to dismiss the superseding indictment under the Fifth and Sixth Amendments and Jury Selection and Service Act, claiming that the Revised Jury Selection Plan for the Northern District of California systematically underrepresented African American eligible grand jurors. 9-ER-1900, 9-ER-1906. The court denied the motion in a written order. 9-ER-1866.

The parties filed motions *in limine*. As Kelly mentions here, the government moved to introduce "other act" evidence that from 2013 through 2020, Kelly filed

---

[3] Makras was convicted, following a jury trial, of Counts Two and Four. He appealed, challenging the sufficiency of the evidence. This Court affirmed. *United States v. Makras*, 22-10355, 2024 WL 1461950 (9th Cir. April 4, 2024).

Statements of Economic Interest, or Form 700s, on which he failed to disclose any gifts from, or loans or debts owed to, Wong or Makras, and "Sunshine Ordinance" declarations certifying that Kelly had completed an annual city ethics training. 7-ER-1761–65. The court granted the government's motion. 1-ER-20. As Kelly acknowledges, however, "the government ultimately did not introduce evidence of Form 700, the Sunshine Ordinance, or the testimony of a witness from the San Francisco Ethics Commission." AOB-21.[4]

Kelly proceeded to trial on June 26, 2023. CR-272. The government called more than 20 witnesses, including six who had worked at the PUC and Walter Wong. 2-ER-35–39.

### D. Verdict, sentencing, and post-trial motions

On July 14, 2023, the jury convicted Kelly as to Counts One through Four (the bank-fraud-related counts), Five (conspiracy to commit honest services fraud), and Seven (honest services fraud). 7-ER-1681. The jury acquitted him as to Counts Eight and Nine (honest services fraud). *Id.*

The district court denied Kelly's post-trial motions for a judgment of acquittal or for a new trial. 1-SER-2. In doing so, the court rejected the challenges

---

[4] Kelly notes that the government introduced two emails he sent to all PUC staff, circulating a Human Resources memo that "reiterat[ed] City regulations about incompatible activities, gifts and outside employment." 7-ER-1787–96; AOB-21. These materials were not the subject of a motion *in limine*, and they were admitted at trial without objection. 2-ER-258, 2-ER-262.

to the jury instructions on honest services fraud that Kelly renews on appeal. 1-SER-12–14.

On March 18, 2024, the court sentenced Kelly to a term of 48 months in prison. 1-ER-3.

## SUMMARY OF ARGUMENT

Kelly has raised two issues on appeal. He challenges jury instructions related to honest services fraud, and the composition of the grand jury. AOB-3 (issues presented).

The district court correctly instructed the jury on honest services fraud. First, the court properly issued a limiting instruction, largely at Kelly's request, about the permissible uses of evidence that Kelly violated local ethics rules and regulations related to accepting gifts and divulging confidential PUC information to contractors during a competitive bidding process. (Instruction No. 9). The instruction properly informed the jurors not to determine Kelly's guilt of honest services fraud on the basis of his compliance with city ethics rules, but permitted them to use evidence of Kelly's noncompliance with these rules in deciding whether Kelly knowingly violated his fiduciary duty. Second, the court properly instructed the jury on the elements of honest services fraud (Instruction No. 25), including the meaning of "corruptly," a term included in the instruction at Kelly's

11

request, and the requisite specific intent.  Kelly's argument for a different specific intent instruction is foreclosed by a prior decision of this Court.

Kelly has failed to raise a standalone evidentiary claim.  While he alludes to evidence of his noncompliance with city ethics rules having been erroneously admitted, *see* AOB-14, AOB-15, AOB-32, the only evidence to which he specifically purports to object (the Form 700s and Sunshine Ordinance Declarations) were not admitted at trial, AOB-19–21.  Kelly has not included an evidentiary claim in his list of issues presented, clearly identified the evidence he means to challenge, or meaningfully developed his contention on appeal.  *See* Fed. R. App. P. 28(a).  Moreover, an evidentiary claim would be meritless.

Kelly has not made a prima facie showing that underrepresentation of African American eligible grand jurors was either legally significant or due to system exclusion, both of which are required by the Sixth Amendment and the Jury Selection and Service Act.  Nor has he made the more demanding prima facie showing of intentional discrimination required by the Fifth Amendment's Equal Protection Clause.

## ARGUMENT

### I.  THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY ON HONEST SERVICES FRAUD

Kelly challenges aspects of two instructions:  Instruction No. 9, on the permissible uses of the evidence of his failure to comply with city ethics rules, and

Instruction No. 25, on the substantive law of honest services fraud as charged in Count Seven.  AOB-17, AOB-21.[5]  The district court incorporated most of the instructional language that Kelly requested below.  His remaining arguments lack merit.[6]

## A.    Standard of review

In evaluating a challenge to jury instructions, the Court reviews the "formulation of jury instructions for abuse of discretion, but review[s] de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case."  *United States v. Liew*, 856 F.3d 585, 595–96 (9th Cir. 2017).  "[T]he relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's

---

[5]  The jury instructions were litigated in the district court as follows:  the parties filed joint proposed instructions and disputed instructions, 1-SER-23; Kelly objected to the government's instructions, 7-ER-1732; CR-286; Kelly proposed additional instructions, 7-ER-1730; CR-287; the government objected to Kelly's proposed instructions, 1-SER-19; the court held a charging conference, 6-ER-1282; the court issued an order resolving the disputed issues, 1-SER-15; Kelly objected to part of the court's order, 7-ER-1727; CR-295; and the court issued its final instructions to the jury, 7-ER-1691; CR 297.

[6]  Kelly acknowledges that the resolution of his evidentiary claim would not affect his convictions for the bank-fraud-related charges in Counts One through Four. AOB-6.  The government does not dispute that a successful challenge to the intent element of the substantive honest services fraud instruction for Count Seven would also undermine the intent element of the honest services conspiracy instruction for count Five.  *See* AOB-33–34.

deliberation." *United States v. Shryock*, 342 F.3d 948, 986 (9th Cir. 2003) (citation omitted).

### B.  Background

#### 1.  *Instruction No. 9, on the permissible uses of local ethics violations*

Kelly recounts the district-court litigation concerning the admission of his "Statements of Economic Interest (Form 700s), and Sunshine Ordinance Declarations." AOB-19–21. Prior to trial, the government noticed its intent to introduce "other act" evidence, either as inextricably intertwined with the charged offenses or under Fed. R. Evid. 404(b), that Kelly, as required by city regulations, filed Form 700s and Sunshine Ordinance Declarations certifying that he had completed the annual ethics training. 7-ER-1761–65. The Form 700s reflected that Kelly had failed to disclose any gifts or loans from, or debts owed to, Wong, Makras, or their companies. *Id.* In granting the government's motion, the court explained that evidence showing that Kelly was "required to make disclosures (or refrain from accepting gifts) but deliberately failed to do so would indeed be probative" mainly of his motive and lack of mistake in making false statements to Quicken Loans. 1-ER-20–21.

Yet as Kelly acknowledges, "the government ultimately did not introduce evidence of Form 700s, the Sunshine Ordinance, or the testimony of a witness from the San Francisco Ethics Commission." AOB-21. Kelly notes that the

14

government introduced emails that he sent to all PUC staff, circulating a Human Resources memo "reiterating City regulations about incompatible activities, gifts and outside employment." 7-ER-1792; AOB-21. Kelly did not object to the admission of these materials at trial, 2-ER-258, 2-ER-262, and it is unclear whether he means to challenge their admission on appeal, *see, e.g.*, AOB-21 (asserting that government's reliance on these emails "resulted in a patchwork jury instruction" on honest services fraud).

To be sure, the witnesses who worked at the PUC testified, both on direct- and cross-examination, about city rules and regulations relating to impermissible communications with contractors during a competitive bidding process, conflicts of interest involving contractors trying to do business with the city, and public disclosures of internal PUC documents with information about an ongoing bidding process. *See, e.g.*, 2-ER-97–99, 2-ER-113, 2-ER-118–19, 2-ER-132, 2-ER-137, 2-ER-155, 2-ER-157–58, 2-ER-163, 2-ER-172–76, 2-ER-202–03, 2-ER-210–11, 2-ER-224–25, 2-ER-240–41, 2-ER-274–78, 2-ER-303–06, 2-ER-325–31, 3-ER-342, 3-ER-371–76, 3-ER-383–85, 3-ER-407, 3-ER-429–30, 3-ER-447–49. Apart from the Form 700s and Sunshine Ordinance Declarations, however, Kelly does not claim to have objected to any of this testimony at trial. Nor does it appear that he did so. Nevertheless, the district court issued a limiting instruction on the permissible uses of evidence that Kelly violated local ethics rules and regulations:

15

> The government has offered evidence regarding the defendant's alleged failure to comply with ethics rules and regulations propounded by the City of San Francisco. These City rules and regulations are not the law you are to apply in this case. You must apply only the law that the Court provides to you in these instructions.
>
> However, you may use evidence of the defendant's knowledge of, and compliance with city ethics rules in deciding whether the defendant knowingly violated his fiduciary duty as a public official.

7-ER-1700.

The first paragraph of this instruction was given at Kelly's request; the second paragraph was added at the government's request. *See* 1-SER-18. In ruling on the propriety of this instruction, the court explained, "[Kelly's] proposed language is proper to prevent potential jury confusion, as the Government's proposed sentence is a proper statement of the permissible purposes of the testimony regarding the ethics rules." *Id.*

> 2. *Instruction No. 25, on the elements of honest services fraud*

The court instructed the jury that to find Kelly guilty of honest services fraud, the government had to prove:

> First, the defendant devised or knowingly participated in a scheme or plan to deprive the City and County of San Francisco of its right of honest services,
>
> Second, the scheme or plan consisted of a bribe in exchange for the defendant's services . . . .

16

Third, the defendant owed a fiduciary duty to the City and County of San Francisco,

Fourth, the defendant acted with the intent to defraud by depriving the City and County of San Francisco of its right of his honest services,

Fifth, the defendant's act was material, that is, it had a natural tendency to influence, or was capable of influencing, an entity's acts, and,

Sixth, the defendant used, or caused someone to use an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

The defendant accepts a "bribe" when he agrees to accept or receive something of value in return for being influenced in the performance of an official act. In order to find that the defendant accepted a bribe, you must find that the defendant acted corruptly.

A "fiduciary" duty exists whenever one entity places special trust and confidence in another person— the fiduciary—in reliance that the fiduciary will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the entity, such that the entity relaxes the care and vigilance that it would ordinarily exercise, and the fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the other entity based on such reliance.

7-ER-1717.

The paragraph that began, "The defendant accepts a 'bribe' when . . ." was added at Kelly's request. 7-ER-1733; *see also* 6-ER-1290. The court agreed to include his entire proposed instruction except for a last phrase: "In order to find

17

that the defendant accepted a bribe, you must find that the defendant acted

'corruptly,' *that is, intending to be influenced in the performance of an official*

*act.*" *Id.* (emphasis added). The court did not include the italicized phrase because

it contradicted another instruction and misstated the law. 1-SER-16. Specifically,

the court explained, a defendant may be convicted of honest services fraud if he

*agrees* to be influenced in the performance of an official act regardless of whether

he in fact subjectively intended to be influenced, as suggested in the instruction.

*Id.* (citing *McDonnell v. United States*, 579 U.S. 550, 572 (2016)).

### C. The jury instructions were correct

#### 1. Instruction No. 9

Starting with Instruction No. 9, Kelly challenges the inclusion of the word

"knowingly" in the second paragraph. AOB-25–32. As set out above, the first

paragraph reminded the jurors that "rules and regulations propounded by the City

of San Francisco . . . are not the law you are to apply in this case." The second

paragraph allowed the jurors to consider Kelly's compliance with city ethics rules

and regulations only "in deciding whether [Kelly] knowingly violated his fiduciary

duty as a public official." 7-ER-1700.

Kelly's argument rests on the mistaken premise that "'knowingly' violating

a fiduciary duty is not an element of honest services fraud." *See* AOB-24–26. His

premise in effect is that a defendant is strictly liable for the "violation of a

18

fiduciary duty" element of the offense. But a "fiduciary duty," in the context of public sector honest services fraud, means a "duty of honest services to the public." *See Percoco v. United States*, 598 U.S. 319, 329–30, 331 (2023); *see also United States v. Mangano*, 128 F.4th 442, 472 (2d Cir. 2025) ("public officials owe a fiduciary duty of honest services to the people they serve"). And to commit honest services fraud, as the jury was correctly instructed, a defendant must have acted with the *intent* of depriving the public of its right to his honest services. 7-ER-1717.

The court's definition of "fiduciary duty," which Kelly does not contest on appeal, itself required a knowing violation. The jury was instructed that a "'fiduciary" duty exists whenever one entity places special trust and confidence in another person—the fiduciary . . . , and the fiduciary *knowingly* accepts that special trust and confidence . . . ." 7-ER-1717 (emphasis added). This Court has previously approved this instruction. *Milovanovic*, 678 F.3d at 723 n.9. Thus, Instruction No. 9 correctly allowed the jury to use evidence of Kelly's noncompliance with city ethics rules for the limited purpose of "deciding whether [Kelly] knowingly violated his fiduciary duty as a public official." *See* 7-ER-1700.

Apart from the word "knowingly," Kelly does not dispute that the jury was properly permitted to use the evidence of his noncompliance with city ethics rules in deciding whether he violated his fiduciary duty. He even told the district court

19

that the government was "free to argue in closing that [his] compliance with city ethics rules somehow bear[s] on [his] violation of a fiduciary duty under the honest services statute." 7-ER-1728. Of course, the violation of a local ethics rule alone does not prove honest services fraud. But evidence that the defendant failed to comply with a state or local rule or regulation may support a finding that the defendant intended to violate a fiduciary duty. *See, e.g.*, *Solakyan*, 119 F.4th at 581–88 588 (relying on state law regarding patient referrals in holding that doctor violated fiduciary duty to patients); *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (rejecting arguing that honest services fraud conviction improperly relied on violation of "state financial disclosure rules and a non-criminal state ethics provision prohibiting legislators from doing business with state entities"); *accord Skilling v. United States*, 561 U.S. 358, 407 n.41 (2010). The jury was properly allowed to consider Kelly's noncompliance with city ethics rules for this limited purpose.

Kelly's argument also fails on its own terms. Starting from the mistaken premise that a knowing fiduciary duty violation is not required, Kelly maintains that unlike the (mere) violation of a fiduciary duty, the knowing violation of such a duty "carries a tremendous moral stigma." AOB-26–27. As he sees it, the inclusion of the word "knowingly," followed by the repetition of the phrase "knowingly violated his fiduciary duty" in the government's closing argument,

20

created a risk that the jury would convict him based on "propensity evidence"—such evidence being his alleged violation of local ethics rules. AOB-26–32.

This is sophistry. Any heightened mens rea could only benefit Kelly by making it more difficult for the jury to use evidence of local ethics violations against him. Moreover, Instruction No. 9 already permitted the jury to consider Kelly's "*knowledge* of, and compliance with," local ethics rules, so the repetition of the word "knowingly" did not change the import of the instruction. *See* 7-ER-1700 (emphasis added). Rather, the instruction accomplished its twin aims: it ensured the jury would not convict Kelly of honest services fraud on the basis of local ethics violations, and it correctly identified the permissible uses for the ethics evidence. The limiting instruction comported with applicable law and plainly inured to Kelly's benefit. His appellate claim should be rejected.

## 2. Instruction No. 25

Kelly argues that the district court improperly instructed the jury on the elements of honest services fraud by failing to include (1) part of a defense-requested instruction defining the term "corruptly"; (2) any other definition of "corruptly"; and (3) an instruction that honest services fraud required a "specific intent to deceive and cheat." AOB-17–19, AOB-34–38. These arguments are meritless.

As defined in 18 U.S.C. § 1346, honest services fraud relies on "the idea that a public official acts as trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them.'" *United States v. Garrido*, 713 F.3d 985, 992 (9th Cir. 2013) (quoting *United States v. Kincaid-Chauncey*, 556 F.3d 923, 939 (9th Cir. 2009)). Like traditional mail and wire fraud, honest services fraud requires a specific intent to defraud. *United States v. Milovanovic*, 678 F.3d 713, 726 (9th Cir. 2012) (en banc). But unlike the specific intent required under traditional mail and wire fraud to deprive a victim of money or property, the specific intent required under honest services fraud is to deprive the public of their intangible right to the defendant's honest services. *See Milovanovic*, 678 F.3d at 726–27 (holding that foreseeable economic harm is not an element of public sector honest services fraud); *see also United States v. Solakyan*, 119 F.4th 575, 590 (9th Cir. 2024) (extending *Milovanovic* to private sector honest services fraud).

Kelly argues that the district court failed to include his proposed definition of "corruptly." In fact, the court added most of the language that Kelly requested except for the final clause in italics:

> The defendant accepts a "bribe" when he agrees to accept or receive something of value in return for being influenced in the performance of an official act. In order to find that the defendant accepted a bribe, you must find that the defendant acted 'corruptly,' *that is, intending to be influenced in the performance of an official act.*

22

7-ER-1733; 6-ER-1290; 7-ER-1717. The court declined to add the final clause because it misstated the law and contradicted another instruction. 1-SER-16.

The court was correct. To be guilty of accepting a bribe, a public official need only *agree* to be influenced in the performance of an official act; the official need not in fact intend to be influenced. *McDonnell*, 579 U.S. at 572 ("Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so."); *accord United States v. Peleti*, 576 F.3d 377, 382 (7th Cir. 2009). By suggesting otherwise, Kelly's proposed instruction misstated the law. Kelly knew this. The next jury instruction (Instruction No. 26) provided additional guidance on what it meant to be influenced in the performance of an official act. 7-ER-1718. The jury was instructed in relevant part, "It is not necessary . . . that the defendant in fact intended to perform an official act, so long as he agrees to do so at the time of the alleged quid pro quo." *Id.* The second clause ("so long as he agrees . . .") was added at Kelly's request, *see* 6-ER-1288; 1-SER-16–17, and is not challenged on appeal. Thus, the district court correctly declined to include Kelly's proposed definition of "corruptly" because it misstated the law and contradicted another instruction.

Next, Kelly argues that since the court did not add his proposed definition, it should have added a definition of "corruptly" found in Ninth Cir. Model Crim. Jury Instr. No. 4.12. AOB-18, AOB-37. But there is technically no model

instruction that defines "corruptly." Model Instruction 4.12 is limited to a

comment, which notes that the term is "capable of different meanings in different

statutory contexts," and offers several examples.[7] More importantly, the court's

final instruction implicitly defined "corruptly"—"agree[ing] to accept or receive

something of value in return for being influenced in the performance of an official

act." 7-ER-1733. The final clause of Kelly's proposed instruction only repeated a

slightly (and incorrectly) modified version of this phrase, defining "corruptly" as

"intending to be influenced in the performance of an official act." No further

definition of "corruptly" was required.

Regardless, the court was not required to define a term with a commonly

understood meaning. *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000);

*see, e.g.*, *United States v. Schweitzer*, 35 F. App'x 331, 332 (9th Cir. 2002) ("[A]

lay jury did not require additional guidance on the meaning of 'engaged in . . .

official duties.'"). As other courts have observed, "corruptly" is such a term. *See,*

*e.g.*, *United States v. Nelson*, 712 F.3d 498, 512 (11th Cir. 2013) ("The term

---

[7] Kelly favors the definition used in obstruction of justice statutes that "'corruptly' must reflect some consciousness of wrongdoing." AOB-18, AOB-37; Ninth Cir. Model Crim. Jury Instr. No. 4.12 cmt. (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704–06 (2005)). More on point is the comment's discussion of a case arising in the bribery context, where the district court "properly rejected a defendant's requested instruction that would have required the government to prove an official acts 'corruptly' when the official uses his official position to commit or aid in the commission of fraud." Ninth Cir. Model Crim. Jury Instr. No. 4.12 cmt. (citing *United States v. Leyva*, 282 F.3d 623, 625 (9th Cir. 2002)).

24

'corruptly' is ordinarily understood as referring to acts done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." (quoting *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990)); *United States v. Pommerening*, 500 F.2d 92, 97 (10th Cir. 1974)). The district court did not err in declining to further define the term "corruptly."

Lastly, Kelly argues that the court should have instructed the jury that honest services fraud requires a "specific intent to deceive and cheat." AOB-18, AOB-34. He acknowledges that this language is not in the model instruction on honest services fraud but can think of "no explanation" for why this might be so. AOB-35–36. The reason is that unlike traditional mail and wire fraud, which require a specific intent to cheat a victim of money or property, honest services fraud requires a specific intent to deprive the public of their intangible right to the defendant's honest services. *Milovanovic*, 678 F.3d at 726–27. Asking the jury to find in an honest services case that the defendant intended to "cheat" his victims would fail to convey this distinction.[8]

The instructions in this case tailored the specific intent requirement to the honest services context, and thereby tracked the language of Model Instruction

---

[8] Defense counsel acknowledged at the charging conference that honest services fraud "doesn't need to be keyed to money or property." 6-ER-1292; *accord* 6-ER-1289.

25

15.34.  The first element required the jury to find that Kelly "*devised or knowingly participated in a scheme or plan* to deprive the City and County of San Francisco of its right of honest services," and the fourth element, that Kelly "*acted with the intent to defraud* by depriving the City and County of San Francisco of its right of his honest services."  7-ER-1717 (emphases added).  This Court has approved this exact language and thus foreclosed Kelly's claim.  *See Solakyan*, 119 F.4th at 592–93 (approving intent language in Model Instr. No. 15.34, that the government must prove that "the defendant devised or knowingly participated in a scheme or plan" and that "the defendant acted with the intent to defraud").  Thus, the district court correctly instructed the jury on the elements of honest services fraud.

### D.    Any error would have been harmless

Kelly's minor complaints about the jury instructions could not possibly have affected the verdict.  Any error in including the word "knowingly" in Instruction No. 9 was harmless because a heightened mens rea would have made it harder for the jury to convict Kelly of honest services fraud based on his noncompliance with city ethics rules.  Any error in not further defining "corruptly" in Instruction No. 25 was harmless because the instruction already conveyed the definition that Kelly had requested:  that to act "corruptly" meant agreeing to accept something of value in return for being influenced in the performance of an official act.  While Kelly stresses a jury note asking for the definition of honest services fraud, the jury

26

ultimately acquitted him on two of three honest services counts.  There was no

possibility that an instructional error affected the verdict.

### E. Kelly has not raised an evidentiary claim, and any such claim would fail

As noted in the summary of argument, despite allusions to what he describes

as improperly admitted "'ethics' evidence," Kelly has not presented a standalone

evidentiary claim.  He has not included an evidentiary claim in his list of issues

presented as required by Fed. R. App. P. 28(a)(5); cited where in the record the

challenged "'ethics' evidence" was "identified, offered, and received or rejected"

as required by Fed. R. App. P. 28(e); or clarified his specific "contentions and the

reasons for them" as required by Fed. R. App. P. 28(a)(8)(A).

For instance, Kelly recounts only the litigation surrounding the admission of

his "Statements of Economic Interest (Form 700s), and Sunshine Ordinance

Declarations"—documents which the government declined to introduce at trial.

*See* AOB-19–21.  He does note that the government introduced two of Kelly's

emails circulating a Human Resources memo entitled, "Summary of Restrictions

On Incompatible Activities, Gifts & Outside Employment."  AOB-21; 7-ER-1788,

7-ER-1793.  But Kelly fails to identify where in the record these documents were

offered, or to clarify that they were in fact admitted without objection, 2-ER-258,

2-ER-262.  Kelly also fails to specify or cite in his argument any other testimony

that he believes would fall within the category of "improperly-admitted 'ethics'

propensity evidence," *see* AOB-32, or clarify that any such testimony was also admitted without objection, *see supra* p 15.

Casting aspersions on an undefined category of "'ethics' evidence" in the broader context of an instructional claim is not specific or clear enough an argument to allow for appellate review. This Court has declined to review similarly generalized assertions of error. *See, e.g.*, *United States v. Panaro*, 266 F.3d 939, 951–52 (9th Cir. 2001) (declining to review argument that record was "'replete with hearsay testimony' of statements made by the alleged co-conspirators," where defendant failed to "identify the objectionable hearsay statements" but merely argued that the district court erroneously admitted "prejudicial evidence" of codefendants' statements); *accord United States v. Nichol*, 134 F. App'x 135, 138 (9th Cir. 2005). Kelly has thus failed to raise a standalone evidentiary claim and should not be permitted to develop his cryptic statements on reply as evidentiary challenges.

Trying to address the merits of Kelly's argument, he has at most claimed that his two emails circulating the Human Resources memo should have been excluded under Fed. R. Evid. 403. *See* AOB-21 (noting admission of these emails); AOB-16 (listing standard of review for a Rule 403 claim); AOB-32 (citing Rule 403). Because Kelly did not object to the emails (or other "ethics evidence") below, 2-ER-258, 2-ER-262, the appropriate standard of review would be plain

error, *United States v. Saini*, 23 F.4th 1155, 1160 (9th Cir. 2022). If Kelly can show "(1) error, (2) that is plain, and (3) that affect[s] substantial rights," the Court then has discretion to grant relief "if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Sanders*, 421 F.3d 1044, 1050 (9th Cir. 2005) (citation omitted).

The emails' admission was not error, let alone plain error. Under Rule 403, a district court may exclude relevant evidence only if its probative value is "substantially outweighed" by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, the emails showed that Kelly was aware of city rules governing conflicts of interest and acceptance of gifts from contractors seeking to do business with the city, and thus tended to prove Kelly's intent to violate his duty of honest services to the public. There was no risk of unfair prejudice. In fact, Kelly introduced additional evidence of local ethics regulations to show that the rules governing public disclosure of PUC documents was "a 'complicated' and 'nuanced' area that required the guidance of the City Attorney to interpret." AOB-14. Any risk of juror confusion was addressed by Instruction No. 9, which explained that "these City rules and regulations are not the law you are to apply in this case, and that "[y]ou must apply only the law that the Court provides to you in [its final] instructions." 7-ER-1700; *see Walker*, 490 F.3d at 1299 (holding that a

29

similar limiting instruction appropriately addressed any risk that honest services fraud conviction would be predicated on finding of state law violation). Nor has Kelly established that any error affected his substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings, as required by the third and fourth prongs of plain error review. In fact, his arguments about "propensity" evidence are all predicated on his mistaken understanding of the word "knowingly" in Instruction No. 9, *see* AOB-32, and further undermined by the jury's acquittal on two counts of honest services fraud.

## II. THE DISTRICT COURT CORRECTLY DENIED KELLY'S MOTION TO DIMISS BASED ON THE COMPOSITION OF THE GRAND JURY

### A. Standard of review

This Court reviews de novo a challenge to the composition of a jury. *United States v. Sanchez-Lopez*, 879 F.2d 541, 546 (9th Cir. 1989).

### B. Background[9]

The Revised Jury Selection Plan ("Jury Plan") for the Northern District of California (NDCA) divides the district into three divisions: San Francisco-Oakland, San Jose, and Eureka. 9-ER-1939. Pursuant to the Jury Plan, a master jury wheel was created for each division. 9-ER-1941. The Jury Plan provides for the empanelment of a district-wide grand jury to be "draw[n] at random from a

---

[9] The jury selection process for the Northern District of California (NDCA) is further detailed in the district court briefing. *See* 9-ER-1934–93.

pool of qualified persons of each jury division for the grand jury panel such

number of prospective grand jurors in the same ratio as the number of registered

voters in each jury division bears to the total number of registered voters in the

district." 9-ER-1943. Using the grand jury wheel for each division, 2,000 grand

jurors were summoned to create the grand jury pool from which the grand jury in

this case was drawn. 9-ER-1926.

Prior to trial, Kelly moved to dismiss the superseding indictment under the

Sixth Amendment, the Jury Selection and Service Act (JSSA), and the Fifth

Amendment's Equal Protection Clause, claiming that the NDCA's Jury Plan

systematically underrepresented Black or African American eligible grand jurors.

9-ER-1906. In support of his motion, Kelly retained a statistician, Jeffrey Martin,

to compare the racial composition of the individuals summoned as potential grand

jurors with that of the eligible grand jury pool for the NDCA. 9-ER-1920. Martin

attempted to calculate the absolute and comparative disparity between the number

of grand jury-eligible African Americans in each jury division in the NDCA (San

Francisco-Oakland, San Jose, and Eureka) and the 2,000 individuals summoned to

create the grand jury in this case. 9-ER-1926. Absolute disparity is the difference

between the percentage of the distinctive group in the community and the

percentage of that group in the jury pool. *See* 9-ER-1923. Comparative disparity,

or relative disparity, divides the absolute disparity percentage by the percentage of the distinctive group in the population. *See* 9-ER-1924.



9-ER-1923–24; 2-SER-116; *see also* 9-ER-1867. Broadly, Martin concluded that the statistical analysis "shows an underrepresentation of Black or African-American persons in each jury division." 9-ER-1925.





33

**C.** **Kelly failed to make a prima facie showing of a violation of his right to a jury selected from a fair cross section of the community**

   *1.* *The district court correctly rejected Kelly's claim under the Sixth Amendment and the JSSA*

The Sixth Amendment confers on a defendant the right to be tried by an impartial jury selected from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522 (1975). The Jury Selection and Service Act (JSSA) adds a statutory right to "grand and petit juries selected at random from a fair cross section of their community in the district or division where the court convenes." 28 U.S.C. § 1861; *see also United States v. Nelson*, 718 F.2d 315, 318 (9th Cir. 1983). Although petit and grand juries must be drawn from a source fairly representative of the community, the juries actually chosen need not mirror the various distinctive groups in the population. *Taylor*, 419 U.S. at 538.

The test for showing a violation of the fair cross section requirement is the same under the Sixth Amendment and the JSSA. To establish a prima facie violation, a defendant must show that (1) the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systemic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). If a defendant makes this prima facie

34

showing, the burden shifts to the government to show that a "significant state interest [would] be manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68.

(i)     <u>The first *Duren* prong is met</u>

Kelly has met the first prong of *Duren*'s prima facie test because African Americans are a distinctive group in the community.

(ii)     <u>Kelly has failed to demonstrate sufficient<br>underrepresentation under *Duren*'s second prong</u>

(a)     *Legal standards*

*Duren*'s second prong "requires that the defendant show underrepresentation in 'venires' from which 'juries' are selected." *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985) (citation omitted). "[A] violation of the fair cross section requirement cannot be premised upon proof of under-representation in a single jury." *Id.* The second prong "requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996). However, "neither *Duren* nor any other decision of [the Supreme Court] specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Berghuis v. Smith*, 559 U.S. 314, 329 (2010).

35

Historically, the Ninth Circuit exclusively used the "absolute disparity test," which examines the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool. *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014) (en banc) (citing *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005)). In doing so, the Court reasoned that the absolute disparity method was "better and more accurate" than a comparative statistical analysis which could "'distort the actual effect[s] of [a] deviation' between a group's representation in the population at large and in the jury pool." *Id.* (quoting *United States v. Potter*, 552 F.2d 901, 906 (9th Cir. 1977)). But *Hernandez-Estrada* changed this approach. After surveying the various analytical methods used by courts—including the absolute disparity test, the absolute impact test, the comparative disparity test, and standard deviation analysis—the Court concluded that district courts "may use one or more of a variety of statistical methods to respond to the evidence presented." *Id.* at 1165.

Comparative disparity, one of the tests urged by Kelly, is calculated by "taking the absolute disparity percentage and dividing it by the percentage of the distinctive group in the total population." *Rodriguez-Lara*, 421 F.3d at 943 n.10. Although this test has the advantage of "illustrat[ing], in a general way, the comparative differences in a manner that takes population size into consideration," it can also overstate the underrepresentation of small minority groups. *Hernandez-*

36

*Estrada*, 749 F.3d at 1163. Suppose, for example, a group constituted 0.1% of the population and had no representation in the jury pool. The comparative disparity of this group would be 100%. Although "[f]ew would argue that the absence of a group representing just 0.1% of the population violates the fair cross-section requirement, [ ] comparative disparity analysis would suggest otherwise." *Hernandez-Estrada*, 749 F.3d at 1163.

An analysis of "standard deviation," another method urged by Kelly, is the "measure of the predicted fluctuations from the expected value." *Id.* (quoting *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977)). A standard deviation analysis is "generally applicable to both large and small population groups" but should not be used exclusively because the "characteristics of the general population differ from a pool of qualified jurors." *Id.* A pool of qualified jurors, by definition, is "not the product of random selection; it entails reasoned disqualifications based on numerous factors." *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996). It would be "irrational to gauge the qualified wheel—an inherently non-random sample—by its potential for randomness." *Id.*

No matter which statistical methods are used, a defendant "must establish not only *statistical* significance, but also *legal* significance." *Hernandez-Estrada*, 749 F.3d at 1165. This Court "look[s] to people not percentages," and the results of any statistical method must be examined in the context of the likely, actual, 'real

37

life' impact on the jury pool at issue." *Id.* "In other words, if a statistical analysis shows underrepresentation, but the underrepresentation does not substantially affect the representation of the group in the actual jury pool, then the underrepresentation does not have legal significance in the fair cross-section context." *Id.*

### (b)    Absolute disparity test

Kelly does not dispute that using the absolute disparity test, he cannot show a legally significant statistical disparity in the representation of African Americans in the grand jury pool. AOB-41–43. His decision not to contest this issue accords with relevant law. Taking the NDCA as a whole, the absolute disparity of African Americans in the jury wheel pool, compared with the number of eligible African American grand jurors, was ▮▮▮▮ 9-ER-1927. This Court has rejected underrepresentation claims based on absolute disparities up to 7.7%. *Thomas v. Borg*, 159 F.3d 1147, 1151 (9th Cir. 1998); *see, e.g.*, *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (rejecting underrepresentation claim where "underrepresentation in absolute terms [was] 2.8% for Blacks, 7.7% for Spanish, and 4.7% for Asians"); *United States v. Kliefen*, 557 F.2d. 1293, 1297 (9th Cir. 1977) (same, based on absolute disparity of 2.9% for African Americans and 4.4% for males). An absolute disparity of 2.84% falls comfortably within this line of cases.

38

*(c)    Comparative disparity test*

Kelly's claim also fails under a comparative disparity analysis. Taking the NDCA as a whole (non-prorated), the comparative disparity of African Americans in Kelly's grand jury pool was ████    9-ER-1927. This percentage, though higher than that generated by an absolute disparity analysis, is not legally significant under *Duren*. Courts have consistently rejected underrepresentation claims premised on a comparative disparity of under 50%. *See, e.g.*, *United States v. Savage*, 970 F.3d 217, 258 (3d Cir. 2020) (rejecting underrepresentation claim based on comparative disparity of 50.24%); *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268 & n.7 (3d Cir. 2019) (same, based on comparative disparity of 54.49% and population percentage of 10.7%); *United States v. Orange*, 447 F.3d 792, 796, 798–99 (10th Cir. 2006) (same, based on comparative disparities "rang[ing] from 38.17% to 51.22%" and population percentages ranging from 1.64% to 8.63%); *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) (same, based on comparative disparities of 58.39% and 40.89%, and population percentages of 2.74% and 7.9% respectively); *United States v. Smith*, No. CR 19-324 (BAH), 2022 WL 425059, at *22 (D.D.C. Feb. 11, 2022) ("Standards are even less clear for comparative disparity, but various cases have rejected challenges presenting values as high as 50% or more."), *aff'd*, 108 F.4th 872 (D.C. Cir. 2024); 2-SER-152–53 (*Nelson* opinion).

39

A district court within this Circuit similarly has observed that courts allow for "comparative disparity rates ranging from 29.14% to 57.27%." *United States v. Smith*, 457 F. Supp. 3d 734, 742 (D. Alaska 2020). *Smith* also noted that this Court, in *dicta*, has permitted a comparative disparity of 52.9%. *Id.* (citing *United States v. Sanchez-Lopez,* 879 F.2d 541, 548 (9th Cir. 1989)). Kelly has not offered any persuasive reason to deviate from these precedents or identified any court to dismiss an indictment based on a comparative disparity of less than 50%.

### (d)    Standard deviation

A standard deviation analysis does not change this result. Standard deviation is the "measure of the predicted fluctuations from the expected value." *See Castaneda*, 430 U.S. at 496 n.17. It compares the number of grand jurors from a distinctive group expected to be chosen from the population in a random sample against the number of such jurors chosen for the grand jury pool in a particular case. *See Rioux*, 97 F.3d at 655 ("Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system."). Here, the standard deviation between the percentage of African Americans in the population and the pool of 2,000 individuals summoned for grand jury is estimated to ███████████ ████████████ 9-ER-1928.

40

Although standard deviation is "grounded in statistical theory, and generally applicable to both large and small population groups," it relies on the questionable premise that the characteristics of the general population may be compared with those of a pool of qualified jurors. *Hernandez-Estrada*, 749 F.3d at 1163; *Rioux*, 97 F.3d at 655. No court appears to have found a violation of the right to a fair cross section on the basis of standard deviation alone. *United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 7184483, at *5 (E.D. Wash. Dec. 8, 2021). And many courts have rejected an underrepresentation claim based on a standard deviation similar to or greater than the estimated ██████████████ here. *See, e.g.*, *Smith*, 457 F. Supp. 3d at 743l; *United States v. Yandell*, No. 2:19-CR-00107-KJM, 2024 WL 4700074, at *3 (E.D. Cal. Nov. 5, 2024); *Cloud*, 2021 WL 7184483, at *6; *United States v. Knight*, No. 3:19-CR-38-MMD-CLB, 2021 WL 951885, at *2 & n.1 (D. Nev. Mar. 11, 2021), *aff'd*, 2023 WL 34698 (9th Cir. Jan. 4, 2023).

### (e) *Legal significance*

Although African Americans may have been underrepresented as a percentage of the total population, neither the Sixth Amendment nor the JSSA requires a grand jury to mirror the statistical composition of the community. Rather, Kelly "must establish not only *statistical* significance but also *legal* significance." *Hernandez-Estrada*, 749 F.3d at 1165. In *Kleifgen*, for example,

the statistical evidence showed that "Blacks and males . . . [were] underrepresented in an absolute sense by 2.9% and 4.4% respectively." 557 F.2d at 1297. But the statistical evidence told only half the story. An array of 100 jurors would include "2.9 fewer blacks and 4.4 fewer males" than the general population, and a grand jury of 23 people drawn from this array on average would "underrepresent blacks by less than one juror and males by approximately one juror." *Id.* This minor disparity, the Court held, was "not substantial underrepresentation." *Id.*

The same result was reached in S*uttiswad*, where the statistical evidence showed "underrepresentation in absolute terms [of] 2.8% for Blacks, 7.7% for Spanish, and 4.7% for Asians." 696 F.2d at 649. Yet in a grand jury of 23 people, these statistical disparities "would translate to underrepresentation by less than one Black person (.644), 1.761 Spanish persons, and 1.081 Asian persons." *Id.* Considering the number of real persons involved, the Court held that "[a]ny disparity [was] similar to those previously approved by this Circuit in *Kleifgen* and may be considered insubstantial." *Id.*; *accord United States v. Jones*, 91 F.3d 156, *2 (9th Cir. 1996) (unpublished) (holding that underrepresentation on grand jury of fewer than two real persons was not constitutionally significant).

Because African Americans here were underrepresented in absolute terms by ▮▮▮▮ statistically, an array of 100 jurors would include ▮▮ fewer African Americans than an array of 100 drawn from the general population. A grand jury

42

of 18 people drawn from this array would translate to underrepresentation by ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ than would be expected from a random sample of the population. Because this figure is below the benchmarks set in *Kleifgen* and S*uttiswad*, any statistical underrepresentation would not be constitutionally significant.

### (f)   *Kelly's arguments are meritless*

Kelly attacks procedural aspects of the district court's approach, but offers little in the way of substantive analysis. *See* AOB-45–50. For instance, Kelly contends that the court should have held an evidentiary hearing, *see* AOB-46, AOB-48, AOB-50, AOB-54, yet he also stresses how the government did "not retain its own statistical expert . . . [or] meaningfully contest the statistical analysis of the defense expert." AOB-46. More importantly, the court assumed for purposes of ruling on the motion that Kelly's numbers were correct. 9-ER-1868. Accordingly, there was no factual dispute to warrant an evidentiary hearing.[12]

Kelly complains, too, that the court "summarily reject[ed] his arguments," AOB-48, ignoring most of the court's nine-page opinion that detailed the statistical

---

[12]  In the event this Court granted Kelly's request for a remand, however, the district court would be entitled to consider whether the prorated numbers, which reflect less underrepresentation, are more accurate. Kelly's expert statistician conducted both analyses, and Kelly has not argued that the non-prorated numbers are more accurate. *See* 9-ER-1881 ("The two analyses are different; one is not necessarily more accurate than the other. The defense expert included both in his declaration to provide fuller data and a more robust analysis.").

evidence, 9-ER-1866–74.  Kelly suggests the court relied exclusively on pre-*Hernandez-Estrada* authority, AOB-47, ignoring that the court also relied on *Nelson*, an opinion and order issued about seven months earlier that exhaustively analyzed and rejected another challenge to the NDCA's Jury Plan.  *See, e.g.*, 9-ER-1871–72 (rejecting Kelly's comparative disparity argument based on *Nelson* and cases cited therein); 2-SER-151–55; *see also United States v. Alessa*, 22-10107, 2024 WL 4211519 (9th Cir. Sept. 17, 2024) (affirming denial of underrepresentation claim where district court's order "rel[ied] in part on its similar rulings in a separate case").

Kelly faults the court for analyzing each statistical method individually "without considering the *combined*" effect of the comparative disparity and standard deviation tests, AOB-47, again ignoring that the court found no legally significant underrepresentation using "a standard deviation analysis, alone *or in combination with the other approaches*."  9-ER-1872 (emphasis added).  This conclusion accords with other cases rejecting underrepresentation claims based on a combination of comparative disparity and standard deviation.  *See, e.g.*, *Smith*, 457 F. Supp. 3d at 741–43 (rejecting underrepresentation claim based on comparative disparity of 50.39% and difference of more than 13 standard deviations); *Yandell*, 2024 WL 4700074, at *3 (same, based on comparative disparity of 29% and difference of seven standard deviations); *Knight*, 2021 WL

951885, at *2 & n.2 (same, based on comparative disparity of 53.34% and difference of more than three standard deviations). Based on this analysis and authority, Kelly has failed to show a legally significant underrepresentation.

> (iii) <u>Kelly has failed to demonstrate systemic exclusion under *Duren*'s third prong</u>

Even if Kelly had made a prima facie showing of the first two *Duren* prongs, he has failed to demonstrate under the third prong that the underrepresentation was "due to systematic exclusion of the group in the jury selection process.'" *Miller*, 771 F.2d at 1228 (quoting *Duren*, 439 U.S. at 364). Contrary to Kelly's assertion that "the real dispute hinged on the second *Daren* factor," AOB-40, the second and third prongs involve discrete, equally important inquiries. *See Hernandez-Estrada*, 749 F.3d at 1165 ("[E]ven assuming that Hernandez has met the second *Duren* requirement, he has not satisfied the third."); *Randolph v. People of the State of Cal.*, 380 F.3d 1133, 1141 (9th Cir. 2004) ("If underrepresentation by itself were sufficient to support a holding of unconstitutionality, the second and third prong of *Duren* would effectively collapse into one inquiry.").

To satisfy the third prong, the defendant must offer a prima facie showing that the underrepresentation is the "result of a cause that is "*inherent* in the particular jury-selection process." *Randolph*, 380 F.3d at 1142 (quoting *Duren*, 439 U.S. at 366) (emphasis in *Randolph*). This Court has contrasted the systemic underrepresentation in *Duren* with the non-systemic underrepresentation in

45

*Randolph*. *See Hernandez-Estrada*, 749 F.3d at 1165. In *Duren*, women, but not men, could opt out of jury service. Moreover, women were presumed to have opted out if they did not return their juror questionnaire. *Hernandez-Estrada*, 749 F.3d at 1165; *Duren*, 439 U.S. at 364. In *Randolph*, by contrast, the fact that "Hispanics return[ed] questionnaires at a lower rate than the general population" did not establish systemic underrepresentation inherent in the jury selection process. *Id.* (citing *Randolph*, 380 F.3d at 1141).

Kelly suggests three ways in which the jury selection process systemically excluded African Americans. These arguments were correctly rejected below. 9-ER-1872–73. First, Kelly states that for some unexplained reason ████████████

████████████████████████████████████████████████████████████████

████████████████ AOB-51.[13] Yet Kelly has offered no explanation to suggest that this irregularity was the result of a problem inherent in the jury selection process.

Next, Kelly faults the district court's decision to excuse jurors who expressed concerns about the COVID-19 global pandemic. He contends that

---

[13] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

because African Americans "suffered higher rates than the general population of co-morbid preexisting conditions that rendered COVID-19 more dangerous . . . , the automatic exclusion of potential jurors who expressed COVID-19 concerns increased the underrepresentation of this distinctive group." AOB-51. This requires a leap in logic. Kelly unjustifiably assumes that individuals will disproportionately express concerns about COVID-19 on a juror questionnaire because they belong to a racial group at heightened risk. And even assuming this were true, individual choices that happen to be made more or less frequently by members of a discrete group do not indicate a problem with the jury selection process itself. *Compare Randolph*, 380 F.3d at 1141 (no systemic underrepresentation where Hispanics tended to return questionnaires less frequently than general population), *with Duren*, 439 U.S. at 364 (systemic underrepresentation where jury system allowed women, but not men, to opt out). Kelly's argument also fails to account for variables such as the availability of vaccines, *see United States v. Roberto*, 23-2026, 2025 WL 484702, at *1 (9th Cir. Feb. 13, 2025), and efforts by the NDCA to minimize the risk of spreading COVID-19 during grand jury proceedings.[14] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[14] *See* NDCA, Notice Regarding Grand Jury Proceedings, available at
https://www.cand.uscourts.gov/notices/notice-regarding-grand-jury-proceedings/
(explaining how the NDCA had "significantly reduced the volume and length of
grand jury proceedings, ha[d] relocated grand jury proceedings to larger facilities



This does not qualify as a systemic failure. *See Smith*, 457 F. Supp. 3d at 740 (finding no substantial violation of JSSA where clerk utilized incorrect proration formula under the jury plan when summoning grand jurors). Even assuming it did so qualify, Kelly has offered no evidence that [redacted] whose summons were returned were disproportionately likely to be African American. Thus, Kelly has "not shown any relationship between the disproportionately low percentage of [African Americans] in the venire and the juror-selection system" used in the NDCA. *See Hernandez-Estrada*, 749 F.3d at 1166 (citation omitted).

In a final effort to undermine the district court's reasoning, Kelly suggests that by including the word "significantly" in its opinion, the court applied the wrong legal standard. AOB-53. Not so. After summarizing the three arguments discussed above, the court concluded that Kelly had "not shown how any of these

---

to allow greater social distancing, and ha[d] instituted various other safety protocols following the guidance of public health experts").

48

events can be presumed to have significantly affected the number of Black or African American individuals in the jury pool *or* that they constitute systemic flaws sufficient to satisfy *Duren*'s third prong." 9-ER-1873 (emphasis added). Understood in context, this sentence rejected Kelly's challenges as applied to either the second or third *Duren* prongs, with the word "significantly" applied only to the second prong. Although Kelly directed these challenges to the third prong, making the court's additional finding not strictly necessary, the opinion was correct in all respects. *See Hernandez-Estrada*, 749 F.3d at 1165–68 (explaining that to satisfy *Duren*'s second prong, defendant must show "significant" or "substantial" underrepresentation).

## 2. *The district court correctly rejected Kelly's Equal Protection Claim*

To make a prima facie showing of an equal protection violation in jury selection procedures, the defendant must establish: (1) the existence of a discrete underrepresented group; (2) the degree of underrepresentation, by comparing the proportion of African Americans in the total population to the proportion summoned as jurors, over a significant period of time; and (3) that a selection procedure that is "susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Castaneda*, 430 U.S. at 494 (citations omitted). While the first two requirements mirror those of the *Duren* test, the last requirement is more stringent because the defendant "must

49

also establish discriminatory intent." *Hernandez-Estrada*, 749 F.3d at 1167. This intent requirement is the "most crucial factor in an equal protection case." *Id.* (quoting *Esquivel*, 88 F.3d at 727).

Having failed to satisfy the *Duren* test, Kelly cannot make the higher showing required by the Equal Protection Clause. He asks the Court simply to infer a prima facie showing of discriminatory intent from the statistical evidence he presented of underrepresentation. AOB-54–57. But an "expert opinion of non-randomness, standing alone, is insufficient to establish discriminatory intent." *Knight*, 2023 WL 34698, at *2; *see also United States v. Mujahid*, 433 F. App'x 559, 560–61 (9th Cir. 2011) ("Mujahid's argument that the 'disparate impact' of the jury selection procedures may suffice as evidence of discriminatory intent is contrary to the Supreme Court's decision in *Hernandez v. New York*, 500 U.S. 352, 362 (1991)."). Kelly's contrary argument, *see* AOB-56 n.17, would improperly collapse the distinction between *Duren*'s requirement of "systemic exclusion" and *Castaneda*'s more demanding requirement of "discriminatory intent." *See Hernandez-Estrada*, 749 F.3d at 1167.

Kelly again suggests the district court imposed too high a burden when it found that he had failed to offer evidence or argument that any aspect of the court's jury selection procedures were "imbued with discriminatory intent." AOB-56–57. But the phrase "discriminatory intent," to which Kelly objects, is often used in the

50

case law to capture *Casteneda*'s third prong. *See, e.g.*, *Hernandez-Estrada*, 749 F.3d at 1167 (describing "discriminatory intent" requirement as "the most crucial factor in an equal protection case" (quoting *Esquivel*, 88 F.3d at 727)). Kelly acknowledges this elsewhere in his brief. AOB-55. Thus, as the district court concluded, "Because Kelly fails to make a prima facie showing of a violation of the fair cross section right under the more lenient *Duren* test, he also necessarily fails to make a prima facie showing of an equal protection violation." 9-ER-1874.

## CONCLUSION

For the reasons set forth above, this Court should affirm the district court.

Dated: **March 14, 2025**            Respectfully submitted,

PATRICK D. ROBBINS
Acting United States Attorney

MERRY JEAN CHAN
Chief, Appellate Section, Criminal Division

*/s/ Ross D. Mazer*
ROSS D. MAZER
Assistant United States Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 17. STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** ___ 24-1825 _____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** ___s/ ROSS D. MAZER_____ **Date** _ March 14, 2025 ___
*(use "s/[typed name]" to sign electronically-filed documents)*

52

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS**
*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** ___ **24-1825** _____

I am the attorney or self-represented party.

**This brief contains** _____**11,730**_____ **words,** including ___0_____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___ s/ ROSS D. MAZER_____ **Date** _March 14, 2025____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

53