No. 24-1825

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES,

*Appellee*,

v.

HARLAN LEROY KELLY, Jr. AKA
Harlan Kelly, Jr.,

*Appellant.*

On Appeal from the United States District Court
for the Northern District of California
the Honorable Richard Seeborg, Presiding.
No. 3:21-cr-00402-RS-1

## APPELLANT'S REPLY BRIEF

STEVEN G. KALAR
Kalar Law Office
1569 Solano Avenue #312
Berkeley CA 94707
(415) 295-4675
Steven@KalarLaw.com

*Counsel for Appellant*
HARLAN LEROY KELLY, JR.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

ARGUMENT.......................................................................................................2

I.    THE GOVERNMENT'S IMPROPER RELIANCE ON LOCAL RULE VIOLATIONS
RENDERED THE JURY INSTRUCTIONS DEFICIENT .................................................2

    A.  The Omission of Defense-Requested Language Limiting the Term,
"Corruptly," and the Failure to Define "Corruptly" Fatally
Undermined The "Honest Services" Jury Instructions......................3

    B.  The District Court's Refusal to Give the Specific Intent Instruction
Fatally Undermined the Honest Services Fraud Conviction...........10

    C.  The Jury Instruction Errors Were Not Harmless...............................13

II.    THE DISTRICT COURT'S ERRONEOUS GRAND JURY ORDER REQUIRES
REVERSAL........................................................................................................14

CONCLUSION ...................................................................................................21

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Arthur Anderson LLP v. United States*, 444 U.S. 696 (2005) ..................... 7

*Duren v. Missouri*, 439 U.S. 357 (1979) .................................................... 15

*Estelle v. McGuire,* 502 U.S. 62 (1991) ........................................... 1

*Kelly v. United States*, 590 U.S. 391 (2020) .................................................. 2

*McDonnell v. United States,* 579 U.S. 550 (2016)............................ 4, 5, 6, 9

*Percoco v. United States*, 598 U.S. 319 (2023) ............................................ 25

## Circuit Cases

*Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996) ...................................... 13

*Mockler v. Multnomah Cnty.*, 140 F.3d 808 (9th Cir. 1988) ............. 12, 13

*Neder v. United States,* 527 U.S. 1 (1999) .................................................... 6

*Percoco v. Unites States*, 598 U.S. 319 (2023) ........................................... 14

*United States v. Kincaid-Chauncey,*
   556 F.3d 923, 941 (9th Cir. 2009) ..................................................... 10, 11

*United States v. Knight*, No. 21-10197, 2023 WL 34698
   (9th Cir. Jan. 4, 2023) (mem.),
     cert. denied, 143 S. Ct. 2478 (2023) .............................................. 15, 17

*United States v. Laurens*, 857 F.2d 529 (9th Cir. 1988) ........................... 19

## Table of Authorities (cont.)

### Circuit Court Cases (cont.)

*United States v. Leyva*, 282 F.3d 623 (9th Cir. 2002) ............................ 8, 9

*United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) .................... 11

*United States v. Nelson*, 712 F.3d 498 (11th Cir. 2013) ............................ 9

*United States v. Strand*, 574 F.2d 993 (9th Cir. 1978)................................ 8

### District Court Cases

*United States v. Goldberg*, 928 F. Supp. 89 (D. Mass. 1996)................. 2, 3

*United States v. Knight*, 2021 WL 951885 (D. Nev. 2021) ................ 15, 17

*United States v. Smith*, 457 F. Supp. 3d 734 (D. Alaska 2020) ........ 15, 16

*United States v. Yandell*, 2024 WL 4700074, at *3 (E.D. Ca. 2024) ... 15, 16

## INTRODUCTION

In its Answering Brief the government fails to grapple with the ramifications of its reliance on local rule violations to obtain honest services convictions, and the implications of that error on jury instructions. Because the district court did not provide the requested definitions of "corruptly," and did not provide a specific intent instruction carving out local rule violations, the jury was confused about the definition of "honest services fraud." That jury confusion quickly manifested in a note asking for definition of "honest services fraud."

This error was not harmless, particularly when the local regulations relied upon by the government specifically discussed permitted (and prohibited) gifts of *food* – the focus of the sole honest services count of conviction.

The government also incorrectly silos the statistical methods necessary to fairly evaluate Mr. Kelly's grand jury, and fails to acknowledge decisions by this Court on grand jury challenges in its reliance on district court orders. This Court should reject the government's invitation to be the first appellate court to uphold underrepresentation of African Americans in a grand jury suffering from over 49% comparative disparity, *and* three standard deviations from predicted representation.

1

## ARGUMENT

### I. The Government's Improper Reliance on Local Rule Violations Rendered the Jury Instructions Deficient

In its Answering Brief the government attempts to avoid the deficiencies in the final jury instructions by isolating each instruction and defense challenge, rather than addressing them as a whole and in the context of the trial record. This approach is incorrect. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.")

Here, the trial record reveals that the government's evidence of Kelly's local rule violations, and its heavy reliance on local rule violations in its closing argument, created the real danger that the jury would improperly convict based on Kelly's violations of local regulations instead of the required statutory elements. *See Kelly v. United States,* 590 U.S. 391, 398-99 (2020) ("The fraud statutes, we held in *McNally,* were 'limited in scope to the protection of property rights.' *Id.,* at 360, 107 S.Ct. 2875. They did not authorize federal prosecutors to set[ ] standards of disclosure and good government for local and state officials."); *see also United States v. Goldberg,* 928 F. Supp. 89, 94 (D. Mass. 1996) ("In other words, what the *Sawyer* opinion makes clear is that mere violation of a state ethics law, standing alone, does not suffice to establish the intent to deprive the citizenry of the 'honest services' of a government official, and is therefore insufficient to

2

establish a violation of the mail fraud statute. Something other than a state ethics law violation - for example, evidence of 'the defendant's fraudulent intent, '... or the defendant's contemplation of' some actual harm or injury' ... -is necessary to support a mail fraud conviction under § 1346.") (internal citations and quotations omitted).

This danger of confusion from the government's "local rules" theory quickly manifested during deliberations, as the bewildered jury asked, "What is the definition of 'honest services' according to the law?" 7-ER-001684, ECP 303, Note 2.

In the unique context of the government's "local rules" strategy in this case, a definition of "corruptly," and clarification of "specific intent," was necessary.

A. The Omission of Defense-Requested Language Limiting the Term, "Corruptly," and the Failure to Define "Corruptly" Fatally Undermined The "Honest Services" Jury Instructions

As explained in Kelly's Opening Brief, three errors plagued the district court's core "honest services" instruction (Jury Instruction 25):

> 1. The court rejected defense-requested language that explained and modified the requirement that the defendant acted "corruptly": "that is, intended to be influenced in the performance of an official act." AOB at 17-18 (citing 7-ER-001717, ECP 297 at pg. 27 of 36, Jury Instruction 25; 7-ER-001524, RT 1667:20-24 (transcript of instruction read to jury); AOB at 36-38.

3

2.    The court rejected a defense-requested definition of the term "corruptly" – a key term in core jury instruction 25. AOB at 18 (citing 7-ER-001728, ECP 295 at 2:1-9).

3.  The court refused to give the defense-requested specific intent instruction as to honest services fraud. AOB at 18 (citing ER-001729, ECF 295 at 3; 7-ER-001714, ECP 297 at pg. 24 of 36).

In its Answering Brief the government counters that Supreme Court or Ninth Circuit authority does not require the limitations and definitions sought by the defense. *See, e.g., Appellee's Answering Brief* at 23 (discussing *McDonnell v. United States*, 579 U.S. 550, 572 (2016) in context of the "corruptly" definition sought by defense).

The government's authority in its Answering Brief, however, *supports* Kelley's claim. Specifically, the Supreme Court's decision in *McDonnell* illustrates the dangers of honest services prosecutions that are not carefully tethered to the limits of the federal statute and caselaw.

In *McDonnell*, the Supreme Court considered the conviction of former Virginia Governor Robert McDonnell. *McDonnell*, 579 U.S. at 555. Among other charges, McDonnell was charged and convicted of honest services fraud. *Id.* To define the "official act" requirement, the parties agreed to refer to the federal bribery statute at 18 U.S.C. § 201. *Id.* at 562. "That statute

makes it a crime for 'a public official or person selected to be a public official, directly or indirectly, *corruptly*' to demand, seek, receive, accept, or agree 'to receive or accept anything of value' in return for being 'influenced in the performance of any official act.'" *Id*. (quoting 18 U.S.C. § 201(a)(3)) (emphasis added).

The evidence at trial revealed that a businessman had gifted or loaned the governor and his wife over $175,000. *Id.* at 561. In return, the government argued, the governor set up meetings with senior government officials and made introductions to Virginia university scientists. *Id.* at 563. The governor urged university staff to consider a study of the businessman's product. *Id.* The governor also hosted events at the Governor's Mansion designed to encourage university researchers to research the businessman's product. *Id.*

Writing for the Court, Chief Justice Roberts described the issue as "whether arranging a meeting, contacting another official, or hosting an event—without more—can be a 'question, mater, cause, suit, proceeding, or controversy,' and, if not, whether it can be a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 567.

The Court answered, "no." "Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more – does not fit that definition of 'official act.'" *Id.* at 575.

*McDonnell* teaches that conduct that is immoral and "corrupt" does not necessarily satisfy the requirements of the honest services statute. Chief

5

Judge Roberts described the Governor's conduct as "distasteful," as "tawdry," and made clear his view that the acceptance of gifts and loans of "Ferraris, Rolexes, and ball gowns" in return for a lobbying officials is morally wrong. *Id.* at 580. Under any common understanding of the term Governor McDonnell acted "corruptly" when he lobbied on behalf of the businessman after being lavished with extravagant gifts and loans. Nonetheless, because of the constitutional and federalism concerns implicated by reading the "honest services" fraud statute too broadly, McDonnell's corrupt conduct (as reflected in the jury instructions) *still* did not constitute a federal crime. *Id.* at 579-80. "Because the jury was not correctly instructed on the meaning of 'official act,' it may have convicted Governor McDonnell for conduct that is not unlawful. For that reason, we cannot conclude that the errors in the jury instructions were 'harmless beyond a reasonable doubt.'" *Id.* (quoting *Neder v. United States,* 527 U.S. 1, 16 (1999)).

Like *McDonnell*, the jury in the present case was repeatedly confronted with evidence of conduct that was hypocritical, immoral, and fairly characterized as "corrupt:" Kelly's violations of local ethics rules in his dealings with Wang. *See* 7-ER-1787, Exhibit 388-0001 (email from Kelly to all PUC staff conveying memo on local ethics rules); 7-ER-001792, Exhibit 389-001 (same).

6

Like *McDonnell*, the instructions in the present case allowed the jury to convict Kelly on "corrupt" conduct that was *not* in fact a legal basis for honest services fraud. Like *McDonnell*, this Court must accordingly reverse.

In the present case, the government exploited the "local ethics rule" evidence by repeatedly emphasizing it in its closing argument:

> Mr. Wong was working with his team on this remodel for over a year. Mr. Kelly did this despite the PUC's rules and policies on not allowing employees to do business with contractors who have business with the City or are seeking business with the City. *Mr. Kelly ignored that rule, which was specifically designed to prevent the type of conflict of interest you've seen that existed between Walter Wong and Harlan Kelly.*

6-ER-001535, RT 1678 (emphasis added).

The defense request for a limiting phrase immediately after the term "corruptly" in Jury Instruction 25 would have made clear that Kelly's corrupt action could *not* be violations of City ethics rules. AOB at 17-18 (citing 7-ER-001717, ECP 297 at pg. 27 of 36, Jury Instruction 25; 7-ER-001524, RT 1667:20-24 (transcript of instruction read to jury); AOB at 36-38. The defense also requested a further definition of "corruptly" using the guidance of Ninth Circuit Model Jury Instruction 4.12 (citing *Arthur Anderson LLP v. United States*, 544 U.S. 696, 704-06 (2005)). That additional "corruptly" definition would have also made it clear to the jury that the "corrupt action" in honest services fraud can not be a violation of local ethics rules. AOB at 18 (citing 7-ER-001728, ECP 295 at 2:1-9).

7

The government disputes Kelly's reliance on *Arthur Anderson* and Model Criminal Jury Instruction 4.12 when the defense sought a definition of "corruptly." The government instead suggests that the Model Instruction's commentary on *United States v. Leyva*, 282 F.3d 623, 625 (9th Cir. 2002) is more persuasive. *Appellee's Answering Brief* at 24 & n.7. Unlike the present case, however, *Leyva* did not involve non-fraudulent conduct that required an additional definition of "corruptly." *Leyva*, 282 F.3d at 625.

In *Leyva*, a former asylum officer appealed his conviction for bribery and immigration document fraud. *Id.* at 624. Leyva sought an instruction that a defendant who acted "corruptly" under Section 201(b)(2)(B) had to use his official position to commit or aid in the commission of fraud. *Id.* at 625. Writing for the Court Judge Wardlaw rejected this argument, finding that the plain language of the statute did not require that language. *Id.*

Notably, in upholding the instruction in *Leyva* Judge Wardlaw emphasized that the district court *did* issue a proper instruction defining "corruptly:"

> [A] public official acts corruptly when he accepts or receives, or agrees to accept or receive a thing of value, in return for being influenced with the specific intent that, in exchange for the thing of value, some act would be influenced. This is known as the quid pro quo in Count Two.

*Id.* at 626 (discussing *United States v. Strand*, 574 F.2d 993 (9th Cir. 1978)).

The definition of "corruptly" endorsed by this Court in *Leyva* was *not* given by the district court in the present case – despite defense requests for

8

additional definition. Under *Leyva*, and Model Instruction 4.12, the district court erred when it rejected defense efforts to further define the vague term "corruptly" in Jury Instruction 25.

Finally, the government argues that the term "corruptly" has a "commonly understood meaning" and therefore did not require definition. *Appellee's Answering Brief* at 24-25. This is untrue. Even the Eleventh Circuit's definition of corruptly cited by the government would encompass violations of local rules (which cannot be a basis for an honest-fraud conviction). *Id.* at 24-25 (citing *United States v. Nelson*, 712 F.3d 498, 512 (11th Cir. 2013) ("The term 'corruptly' is ordinarily understood as referring to acts done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful ends or means."))

If "corruptly" has a "commonly understood meaning" as claimed by the government, there would have been no need for the specific "corruptly" definition endorsed by this Court in *Leyva*. *Leyva*, 282 F.3d at 626. Moreover, any "commonly understood meaning" of the term "corruptly" is overbroad. For example, a layman's understanding of "corruptly" would easily encompass a Governor's acceptance of Ferrari loans, ball gowns, a Rolexes, and cash "loans" in return for leaning on state officials to engage with a "corrupt" businessman. Yet the Supreme Court has made it clear that this behavior is not the type of "corrupt" conduct that constitutes honest services fraud. *McDonnell*, 579 U.S. at 575. Mr.

9

Kelly's arguable violations of local ethics rules in his dealings with Mr. Wang would be considered "corrupt" under any "commonly understood meaning" of the term – but as in *McDonnell*, that behavior is *not* the type of corrupt conduct that can sustain an honest services fraud conviction. The government's assurance that "corruptly" has a commonly understood meaning has no basis in authority, runs contrary to common sense, and raises serious federalism and overbreadth issues by permitting honest services convictions for local rules violations.

B. <u>The District Court's Refusal to Give the Specific Intent Instruction Fatally Undermined the Honest Services Fraud Conviction</u>

The defense sought an instruction from the district court requiring the government to prove that Mr. Kelly had a specific intent to defraud, in relation to the Honest Services fraud allegation:

> **Specific Intent to Defraud**: The Court's draft jury instructions do not presently include an instruction that honest services fraud requires a "specific intent to defraud." The comments to Ninth Circuit Model Jury Instruction 15.34 (Honest Services Fraud) specifically state that "Honest services fraud requires a 'specific intent to defraud.'" *Id.*, citing *United States v. Kincaid-Chauncey*, 556 F.3d 923, 941 (9th Cir. 2009). The defense asks the Court to instruct the jury that honest services fraud requires specific intent to defraud.

7-ER-001729.

Defense counsel at trial was correct: the model instruction's commentary does discuss the mens rea for this offense: "Honest services

10

fraud requires a "specific intent to defraud." *Kincaid-Chauncey*, 556 F.3d at 941; *see also Solakyan*, 119 F.4th at 593 (approving the intent language stated in Model Jury Instruction 15.34)." Ninth Cir. Model Crim. Jury Inst. 15.34, comment.

The government argues that the model instruction (and Instruction 25, which was based on the model instruction) is sufficient to meet the *mens rea* requirement for Honest Services fraud. *Appellee's Answering Brief* at 25 (citing *United States v. Milovanovic*, 678 F.3d 713, 726-27 (9th Cir. 2012). The government is correct for a "normal" honest services case: the model instruction (and Instruction 25) track *Milovanovic*'s language on specific intent.

That standard instruction, however, is not sufficient when the government introduces and relies upon local rule violations (which are prohibited bases for conviction). Because the government introduced evidence of Kelly's distribution of local rules, knowledge of those rules, and violations of those rules, and because the government repeatedly relied upon local rule violations in its closing argument, a more-tailored specific intent definition was necessary.

Instruction 25 as given to the jury summarized the mens rea element as follows: "Fourth, the defendant acted with the intent to defraud by depriving the City and County of San Francisco of its right of his honest services;." 7-ER-001717 (Jury Instruction 25). In the context of a trial wrongfully infused with evidence of local rules and local customs, the jury

11

would logically conclude that the City's right to "honest services" from Mr. Kelly would include the right to have the City's own rules and regulations followed. Evidence of the jury's confusion on this point is manifest: its very first note asked for a definition of honest services fraud.

This problem was not cured by Jury Instruction 9, discussing local rules. Jury Instruction 9 was an insufficient remedy for the problem created by the local rules evidence and arguments:

> The government has offered evidence regarding the defendant's alleged failure to comply with ethics rules and regulations propounded by the City of San Francisco. These City rules and regulations are not the law you are to apply in this case. You must apply only the law that the Court provides to you in these instructions. However, you may use evidence of the defendant's knowledge of, and compliance with city ethics rules in deciding whether the defendant knowingly violated his fiduciary duty as a public official.

7-ER-001729 (Instruction 9).

Instead, given the specific evidence that came into the case, and the arguments relied upon by the government, the district court should have provided a mens rea instruction that made it clear that Mr. Kelly's specific intent to violate the rules and regulations of the City and County of San Francisco was *not* sufficient to establish guilt. Default reliance on model instructions did not suffice: the district court should have tailored the instructions to reflect the issues before the jury *in this case*. *Mockler v. Multnomah Cnty.*, 140 F.3d 808, 812 (9th Cir. 1998) ("Jury instructions must

12

be formulated so that they fairly and adequately *cover the issues presented*, correctly state the law, and are not misleading.", quoting *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir.1996) (citation omitted)) (emphasis added).

This Court should accordingly reverse.

### C. The Jury Instruction Errors Were Not Harmless

In a peculiar twist of logic the government argues that the jury *acquitting* Kelly of two of the three honest services count shows that the district court's errors were harmless. *Appellee's Answering Brief* at 27. Those acquittals show the opposite: the flawed jury instructions created the pathway for conviction on the one honest services count that the jury could agree upon. With correct instructions, the jury would have acquitted on all three honest services counts.

It is no coincidence that the jury convicted on Count Seven. That count alleged that Mr. Kelly accepted a meal from cooperator Wang in Hong Kong. *See Superseding Indictment*, 7-ER-001783 (Count 7). The San Francisco ethics memoranda distributed by Kelly – and introduced by the government as part of its case in chief – specifically discuss permitted (and prohibited) gifts of food. *See* 7-ER-001790 ("The following are examples of gifts *not* covered by gift restrictions . . . Gifts or drink without regard to value, *which are to be shared in the office*.") (second emphasis added). A meal in a Hong Kong restaurant was indisputably not "shared in the office." The jury convicted on the only honest services count alleging an exchange

13

expressly discussed in the ethics memoranda introduced by the government: food.

Interestingly, in another honest services case the Supreme Court reversed for instructional error and found the error was not harmless – *despite* acquittal on some of the charged counts. *Percoco v. United States*, 598 U.S. 319, 325 (2023) ("The jury convicted Percoco on count 10, as well as two other charged counts relating to additional conduct, but acquitted him on the other charges.") Like the Supreme Court in *Percoco*, this Court should find that errors in the honest services instructions was not harmless and should reverse Kelly's convictions.

## II. The District Court's Erroneous Grand Jury Order Requires Reversal

The district court erred when it rejected Kelly's dramatic showing of underrepresentation of black grand jurors, without even conducting an evidentiary hearing or demanding expert analysis or declarations from the government.

The government's attempt to defend the district court's decision would nullify any meaningful requirement of grand jury representation. Much of the Answering Brief is devoted to explaining or discussing facts or issues not in dispute, or knocking down straw men by analyzing the methodologies *separately*. *See Appellee's Answering Brief* at 36 – 37 (discussing "absolute disparity," "comparative disparity," and "standard

deviation" separately); *id.* at 38-41 (discussing Kelly's showing regarding each separate method).

The gravamen of Kelly's complaint, however, is that the district court erred when it held that Kelly's *combined* showing under two methods was sufficient to satisfy the second prong of *Duren v. Missouri,* 439 U.S. 357 (1979). *See* AOB at 45 ("The analysis of defense expert Jeffrey Martin revealed that this venire underrepresented African Americans under the 'comparative disparity' test, and while employing a standard deviation analysis. 9-ER-001920-32.")

The government devotes but one paragraph of its Answering Brief to addressing the *combined* disparity analysis of Kelly's expert. *Appellee's Answering Brief* at 44. In support of its argument that the combined showing was insufficient, the government relies on three district court cases. *Id.* at 44 (citing *United States v. Smith,* 457 F. Supp. 3d 734, 743 (D. Alaska 2020); *United States v. Yandell,* 2024 WL 4700074, at *3 (E.D. Ca. 2024); and *United States v. Knight,* 2021 WL 951885, at *2 & n.2 (D. Nev. 2021)). Each of these district court orders is inapposite or unpersuasive.

First, the district court's opinion in *Smith* is neither controlling or informative. Notably, this Court did *not* endorse the findings of the district court regarding underrepresentation in its memorandum disposition upholding the order. *See United States v. Smith*, No. 23-30036, 2025 WL 1098564, at *1 (9th Cir. Apr. 14, 2025) (mem.) Instead, this Court assumed that even if the statistical showings were correct Smith failed to make the

15

necessary showing under *Duren*'s third prong. *Id.* ("Even assuming that Smith's statistical calculations are accurate and statistically significant, Smith fails to demonstrate legal significance.") *Smith* thus carries little or no weight in the second prong analysis of *Duren* for the case before this Court.

Moreover, it bears emphasis that the district court in *Smith* properly exercised its role in examining underrepresentation by conducting an evidentiary hearing. *Smith*, 457 F.Supp at 736 ("The Court held an evidentiary hearing on the motion on January 9, 2020, and heard testimony from Mr. Martin.") In marked contrast, the district court in the present case held no evidentiary hearing – even though the government failed to submit any countervailing expert declarations. The district court's decision in *Smith* sheds no light on the combined statistical showing now before this Court.

Similarly, the district court's decision in *Yandell* is not persuasive. Of note, undersigned counsel was lead trial counsel for Mr. Ron Yandell in that case. Mr. Yandell was convicted after a lengthy trial, and has filed a notice of appeal. That appeal is not yet briefed. This Court, therefore, has not had an opportunity to evaluate the deeply troubling disparities acknowledged – but tolerated -- by the district court in *Yandell*. *See generally Yandell*, No. 2:19-CR-00107-KJM, 2024 WL 4700074, at *5 ("This is not to say these disparities are meaningless or no cause for concern. If Martin is correct in his opinion that the disparities he calculated are attributable to a

16

systematic cause—a question this court need not and does not reach—then that cause should be corrected.")

The district court's decision in *Knight*, like the district court's decision in *Smith*, is also not analogous. The government conspicuously omits reference to this Court's memorandum disposition in *Knight*. *See Appellee's Answering Brief* at 44. This Court considered Knight's appeal of the denial of his challenge to the grand jury composition. *See United States v. Knight*, No. 21-10197, 2023 WL 34698, at *1 (9th Cir. Jan. 4, 2023), cert. denied, 143 S. Ct. 2478, 216 L. Ed. 2d 441 (2023). During oral argument, counsel for Knight "acknowledged that there was a gap in the evidence and requested that the matter be remanded for a hearing so that the record could be better developed." *Id.* at *1. As this Court explained, "[Knight's counsel] has essentially conceded that the existing record does not support his claim or the relief requested . . . . In the absence of evidence showing that invalidation is warranted, we affirm the district court's Sixth Amendment and JSSA determinations." *Id.* By marked contrast, Kelly does *not* concede any deficiencies in the record now before the Court, and does not admit to any "gap in the evidence." The imperfect record conceded in *Knight* (and the resulting affirmance of the district court's order) has no bearing on the robust statistical showing now before this Court.

Undersigned counsel has found no appellate decision that has upheld a combined statistical showing as dramatic as the 49.15% "comparative disparity" in the present case *and* a three standard deviation discrepancy. It

17

appears that the government has also found no such appellate decision. The government now asks this Court to hold, for the first time, that a grand jury was fair and representative when nearly *half* of the expected African Americans in the jury pool were missing as shown by a robust combined significant showing. 9-ER-001927, Declaration of Expert Jeffrey Martin at 8 1168. Moreover, no appellate court has tolerated such a dramatic combined underrepresentation when the district court did not bother to conduct an evidentiary hearing or require declarations or expert analysis from the government.

This Court should reverse.

The government's minimization of the *Duren* third-factor showing is equally unpersuasive. *Appellee's Answering Brief* at 45 (discussing third *Duren* prong, "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 at 364).

The government's criticism of Kelly's showing would impose an impossible – and legally unwarranted – burden on defendants mounting a challenge. For example, in an undisputed showing Kelly revealed that jurors were wrongly summonsed from San Jose, instead of from Oakland and San Francisco (where the proportion of African Americans is higher). Although the government does not dispute this fact, it complains that "Kelly has offered no explanation to suggest that this irregularity was the result of a problem inherent in the jury selection process." *Appellee's Answering Brief* at 46. To expect Kelly to explain the details of the

18

shortcomings of the District Court clerk – without full access to the Clerk's records -- misapprehends the evidence necessary for a *prima facie* showing. *Duren*, 439 U.S. at 659 ("Finally, in order *to establish a prima facie case*, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process.") (emphasis added).

When a prima facie requirement has been used *against* a defendant, this Court has been clear that it involves a very minimal showing. *See United States v. Laurins*, 857 F.2d 529, 541 (9th Cir. 1988) ("The judge found that the deposition testimony of Union Street employees about Laurins' boxing and removal of GDL documents was sufficient to make out a prima facie case for obstruction of justice. *All the government needed to show was evidence that, if believed by the jury, would establish the elements of an ongoing violation*.") (emphasis added). That same low showing required for a prima facie case in *Laurins* must also be applied in the *Duren* analysis. Kelly has identified three flaws in the grand jury selection which, if believed by the court, would establish the existence of systemic exclusion. The government's unsupported requirement that Kelly documents the Clerk's errors as "inherent in the jury selection process" – beyond the undisputed facts -- is an evidentiary demand far beyond the prima facie showing required by *Duren*.

Similarly, the government does not dispute that the Clerk of Court simply failed to mail out replacement summons for potential grand jurors.

19

*Id.* at 48. The government again relies on the district court's decision in *Smith* to argue that this second failure of the Clerk's system does not qualify as systemic failure. *Id.* (citing *Smith*, 457 F. Supp. 3d at 740). The government fails to reveal, however, that *this* Court addressed *Smith* in a memorandum disposition. *Smith*, 2025 WL 1098564, at *1 (mem.). This Court rejected the appellee's argument in *Smith* that an incorrect proration formula satisfied prong three of *Duren*, because a corrected formula could actually *decrease* Native American participation. *Id.* ("For example, under the correct proration formula, the number of white jurors could actually increase while the number of American Indians/Alaska Natives could decrease as it would have led to greater representation from the Anchorage division, which has the smallest percentage of Native Americans/Alaskan Natives and a similar percentage of white residents as the other divisions.") The incorrect proration formula in *Smith* has no relevance to the Clerk's undisputed failures in the present case.

Jurors pulled from the wrong venue, the disprorortionate impact of COVID waivers, and the Clerk's errors in replacement summons: these three systemic problems satisfy then prima facie showing required by *Duran*'s third prong. The district court erred when it held otherwise.

## CONCLUSION

For the foregoing reasons, this Court should reverse the convictions of Mr. Kelly on Counts Five and Seven.

It should also reverse all convictions from an indictment returned by a fundamentally unrepresentative grand jury, that excluded nearly half of expected African American jurors.

 

Respectfully submitted,
STEVEN G. KALAR

May 30, 2025                  _____s/_____
                                Kalar Law Office

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(B)-(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 4,989 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words ).

May 30, 2025

s/
_____
STEVEN G. KALAR
Kalar Law Office

22